Good morning, distinguished judges of the 4th Circuit Bench. My name is J. Wendell Gordon, and I represent a gentleman by the name of Adrian Muldrow. And, judges, as I mentioned in my motion for summary judgment, this case is about being called a nigger multiple times by a customer or store manager while on the job, then being treated like one by an employer for having the dignity and self-respect to complain. The admissible facts in the record and reasonable emphasis drawn therefrom will show that the old adage is true. It's not what they call you, but it's what you answer to. Mr. Muldrow answered to dignity and respect, and he deserved to be treated better by his employer. In or about 2007, Mr. Muldrow began working for Schmidt Baking. And during his employee at Schmidt Baking, he had received a promotion. Doesn't the record show pretty clearly that even before all this business happened at the Royal Farms store, they had planned to let him go? Absolutely not, Your Honor. I'm glad you asked that question. I would like for this honorable court to turn to page 187 in the record extract. And this document gives clear proof of the intent, although I have additional reasons why, but you will see a statement that was generated by Selina Windsor on page 187. Well, but wasn't there an internal exchange of e-mails between, what's his name? Mr. Muldrow. Between Sprinkle and Kenend about getting rid of him because he was a problem? Well, that's the vague portion. It didn't say get rid of him. What's vague about it? Because it says we are thinking about replacing him. It didn't say anything about terminating him. But I really want this honorable court, I really want to direct your attention to page 187 in the record extract because I think that speaks volumes to the intent of the supervisor at that time. This is a statement from a Ms. Selina Windsor. And what it says is that she says, and I'm starting at 186 at the bottom, and I'll just read it to this honorable court. It says, I called Vinnie. He told me to violate him and call Andy from Schmitz, which I did. Andy said he will take care of it and apologize. It goes on to state that I also received a call from Adrian's boss, Jody. She said if I had a problem again, she gave me her cell number to call her directly. Well, isn't that referring to problems related to his work performance? But she said again. So where they try to say that they intended to fire him on that day, where she says, if you have a problem again, give me a call, that actually is inconsistent with that statement. But not only that, Mr. Muldrow was never informed of any e-mails going back and forth between he and Ms. Jody Sprinkle. Well, they don't have to inform him about internal e-mails, do they? Well, there was a statement made by one of the managers, Mr. Andy Zinkan. He says if an employee is not informed of a reprimand, was his language, he said then it's a waste of time. So basically what he was saying was that if the employee is not informed, then there is no discipline that can be meted out. No, that's not what he said. He just said if you don't tell the employee what the employee is doing wrong, the employee is never going to get better. I think that really you have to deal with the record as it stands. Your client had eight violations of company policy, and some of which would have resulted in firing before this. Now, I think it's fair to ask the company why they didn't fire him earlier, and perhaps they have an answer to that. But they didn't, and then this violation came along. So that is the record, that those are the undisputed facts. They may not have been deserved, but they were violations. Well, they actually weren't violations, most respectfully. Well, you do say that in your brief, so I went back and checked the joint appendix, and in my view, they're violations. I mean, do we want to go through them one by one, or are you just going to— I can go through them. I can go through them. Okay. But I will also say this, Your Honors, that there's also testimony in the record that Mr. Muldrow was terminated because of the events on April 29th, May 3rd, and May 4th, and they didn't even speak to the record. There's deposition testimony that comes from not only a sprinkle, but that also comes from Mr. Andy Zinkan. Wasn't that testimony in the terms of this was the last straw? No, Your Honor. No. It didn't say anything about prior violations. They said only this was the reason for firing. That's what they said, and that was— Okay. Where would I find that in the JA? In the— In the joint appendix. Not in the brief, but in the joint appendix. I know. I'll start with my brief to get you there. Of course, indulgence. Sure. I'm sorry, I don't want to take up all your time. I can certainly get you there, but it's definitely in the record. Okay. Right. Page 32 in my brief, but I'll take you there. Okay. You ready? There are a lot of numbers. Uh-huh, I'm ready. Okay. JA 36 through 37? I think that's your complaint. 196 and 207? 36 to 37 is your complaint. Okay. Those aren't facts in the record, right? Okay. 196? 196, 207, 229. Okay, fine. And I have more. I have more. JA 335 from Sprinkle. What question do you think you're answering? I thought this court wanted me to advise her, where in the record does it indicate that he was fired for those three reasons? Only those three reasons? Yes, as opposed to— Well, it's cited in the brief. I can give you a number of pages. You've just given me all of these on page 32. And I wasn't even finished. Okay, fine. Do you have others that you did put in the brief? Yes, I did. Okay, fine. Give me those two. JA 442. Uh-huh. JA 349 through 50. 353 through 54. 361. I wonder why you didn't put that in your brief. It's all in my brief. I'm reading from— Well— Okay, if it's in your brief, we'll look at it to be sure. I didn't find that on those pages that you cited in your brief. Oh, yeah. It's cited in there. Okay. Well, let me—can I ask you a question— Yes, sir. —about the retaliation claim— Yes, sir. —if everything else is in your brief? Is it—or is it your—what's the protected conduct in this case? Is it Mr. Muldrew's call to his boss about the foul language that was used at the Royal Farm Store? Is that the protected conduct in which they're retaliating? Yes, Your Honor. What they have is a policy on harassment, not on discrimination but on harassment. And the policy says— Well, whether they have a policy or not, is that— I think he's allowed to complain about racial wrongdoings, whether it's in the policy manual or not. My question is, is that what you're relying on as protected conduct for which they cannot retaliate? Well, that, in addition—well, yes. Okay. Does that have to be the but-for cause of his termination or just a factor in it? But-for. But—well, according to the new— Well, yeah, I think that's what the Nassar case said. Right. That's what the Nassar case said. We never submitted to the fact that there was any employment problems because we're dealing with these three dates. Okay, the April 29th event— I'm not talking about his prior record. I'm talking about retaliation against him for making a complaint. That's a separate claim from discrimination. Yes, sir. Right. And the retaliation claim, as I understand it, is he made a report about Royal Farms. Somebody was mad that he made a report about Royal Farms, and they fired him because of that. That's the claim, right? Yeah, because they said it caused a forest fire. Right. It caused a forest fire. It caused a forest fire in Royal Farms. Right. And so Royal Farms acted swiftly. Within two hours of making that complaint, they fired him. And that's really the crux of it. When we start dealing with another case— Okay, if that has to be the but-for cause of his firing, how does all this other misconduct factor into that? It was the pretext, Your Honor. And the reason why I say that, because his last grievance was at least five months before he was fired. That is, somebody told him that there's an issue here, you need to resolve it. Now, a letter of concern is not discipline. A letter—I'm sorry, counseling is not discipline. So when you look at my client's— Says who? I mean, who defines that? Well, Sprinkle said counseling is counseling. It's not discipline. Okay. A letter of concern, that testimony came out in the deposition. But that was not objected to. No one opposed it. So we look at this case in the light most favorable to the non-moving party. Even when you start talking about those e-mails where they say, I'm going to replace him anyway, well, that's very vague. Is he going to get transferred? Is he going to get substituted out? What are they going to do with him? They didn't say, I'm going to fire him. And, again, if you look at page 187, when she gets that letter from Ms. Selena Windsor, and Selena, she's told that if you have a problem again, give me a call, which suggests, or at least the inference is in Mr. Muldrow's favor, that she did not intend to fire him. It was only after she learned that he made that complaint. And she states it clearly. She says that I made the decision to terminate Mr. Muldrow after I learned of the complaint of him alleging being called a nigger multiple times. But maybe the broader point is that he got into an argument with a customer. And that was, as Judge Mott said, that was the last straw, not excusing the use of ungood language. But isn't that, didn't he just reach the end of the line? No. That's what I'm trying to explain to your honors. No, he did not. I think that what you're saying to us, because these other earlier problems didn't get him fired, that they don't count. That's not the way the law is. Well, I'm going from the testimony in the record. And that's supposed to be construed in the light most favorable to the plaintiff. What about the documents in the record? The documents in the record? You can look at the documents in the record, but the testimony, when they gave a reason for his termination in writing. Well, what about the previous reprimand? That wasn't considered. Again, that wasn't considered. That was something that was developed after the fact. And the reason, again, I asked the court to review Selina Windsor's letter, where she says, if you get in trouble again. Now, that letter, if you look at the time on it, it's written at 3.42 in the p.m. So that's long after the fact. And it couldn't be more clear of her intent. There's no reason for her to call her back on the cell phone of Mr. Muldrow. If I already made my decision to fire him, I'm not going to give the store a number to call me back if you have another problem with him. It makes no sense. So the reasons that they gave for his firing are pretext. The early delivery, that's not even a terminal offense. In fact, Mr. Zinkan expected only a warning, a verbal warning at that. Ms. Sharon Crispin says no one has ever been fired for a vendor violation, which I want to argue this with regard to that. I believe it was the Vance case that defined what a supervisor was. And in this case, I will argue for the first time, because the case is new, that that store manager was a supervisor. Supervisor of Mr. Muldrow. And the reason why I said that, because she had the right to discipline him. She had the right, according to their testimony. She's not a Schmidt employee. She's not a Schmidt employee, so I'm looking for an expansion based upon this new court case, because they limited what a supervisor is. So we're dealing with strict liability, at least on one of the claims on this issue, because if she has the right to discipline him with a vendor violation, even though there's no evidence in the record that there's a vendor violation, if she has the power to transfer him out of her store, if she has the power to fire him or her conduct culminates in her being fired. Where does it say she can fire him? It culminates. The case law states culminates. It culminates. It says it empowers the employer to take tangible employment action if the supervisor's harassment culminates in tangible employment action. The employer is strictly liable. Well, if that's the case, then any customer who complains about an employee is a supervisor if the employee gets disciplined because of the customer's complaint. Power to transfer, power to discipline. They expressly talked about vendor violations, even though there's none in the record. They expressly talked about it, and they expressly indicated that certain things can happen if you have certain vendor violations. I'm sorry, Schmidt. Schmidt, I'm sorry. The Supreme Court has indicated that a supervisor is one who has the power to transfer, to fire,  A vendor violation would be a discipline of an employee. Transferring an employee out would be something that they have the power to do. So in that store, she's a supervisor. In that store. I think I'm over my time. All right. Thank you. Thank you. Thank you. May it please the Court, my name is Kathleen Pontone, and with me at counsel table is Stephanie Barron and Julie Siegel. We're all of Miles and Stockbridge, and we represent Schmidt Baking Company in the matter. I appreciate all the attention the Court has obviously already devoted to the important case, and that you've read both the briefs and the record well, and I'll try not to go over things that you don't want to hear about and limit my remarks to the things that you've obviously indicated you're interested in. Along the way, maybe you could address what I take to be one of his key arguments in front of us today, which is that this was the prior disciplinary or not, or discussion, or whatever they were, actions were way in the past, months earlier, and that really the only reason that he was fired, his client was fired, was because of some discriminatory action on the part of your client. Yes, Your Honor. Thank you. I heard that. I don't think the record supports that. What the record does show, and what Mr. Muldrow admitted in his deposition, is that he was told at the time he was fired, at the time suspended, that it was for the falsification, which occurred the day before on May 3rd, as well as poor job performance, which does encompass both the thing that happened April 29th, and anything that they're subsequently going to find in the investigation, as well as the prior discipline. And it's axiomatic that an employer certainly can consider someone's prior record in making a decision. As I think you're aware, Ms. Sprinkle indicated in November of 2009 that she wanted to terminate Mr. Muldrow, and I can give you a cite to that. It's at 141, Ms. Sprinkle has an affidavit on that, and at 140 she indicates that she wanted to terminate him, she intended to terminate him. Why wasn't he terminated? The union interceded on his behalf, Your Honor, and asked that he get another chance. And again, that is in the record, in both her affidavit at 141, as well as in the email. That the union interceded on his behalf, which made sense. That's what unions do. They say, give him another chance, and that's what she did. I think your colleague brought up in the very beginning of his argument something from some witness statement, handwritten statement, which said, if you have a problem again, let me know. Right. And he attached great significance to that. Right, and I think that's totally misplaced. What she's saying is if you have a problem, and it could be with this driver or another driver, that you should call me. You should call me directly, rather than going through the process. She called Vinnie Hayhoe, who was Royal Farms' manager, who called Andy Zinkin, who was a project sales manager for Schmidt, and so it was an attenuated chain. She's saying, you know, call me if you have a problem immediately. Who is the person that's making the statement? That is what Ms. Windsor says Jody Spreckel said when she spoke to her. And actually, I don't think that is what the document really does say. If you look at what the statement says. In any case, that's what it means. It means if you have a problem, please call me directly. I don't think that proves somehow that we intended to keep him on. What do you make about the forest fire statement and the other separate statement that indicated, at least Mr. Schmidt indicated he overheard a telephone conversation to, quote, find a reason to fire him? Yeah, first of all, the statement gets paraphrased a number of ways, and I understand that while I have to accept what gets said for purposes of summary judgment, I do want to point out the forest fire comment means, hey, it's a big deal. You've made a discrimination complaint. People are going to look into it. I don't think there's anything wrong with that. I don't think that shows any intent to discriminate. Well, I mean, that's one interpretation. Another is that a valued client is upset about what happened at their store, and we need to find a reason to get rid of this. But that doesn't establish but for cause. What that establishes is we're going to look into it. And then the second, I do think it's important for your honors to understand that these things occurred to Mr. Muldrow sequentially. No one ever heard about that until he sent an e-mail to the EEOC, it's JA-166, where he first mentions the forest fire comment, and then what he says in the next document, which is 167, he says she said suspend impending termination for poor performance. She doesn't say suspend him, find something. That's what the record actually shows. That's what the phone call said when they were sitting there in the office. Well, that's what he says. That's the day of the event, right? Yeah, right. That's the day of the event. And what it's saying is you need to get to the proper cause. You need to figure out what happened. Well, that's one view. But I understand, Your Honor. The problem is we're at summary judgment. We are at summary judgment. So that's your view. Yes. To be as a contrary view of the evidence, why doesn't a jury get to sort it out? I'm sorry? Why doesn't a jury get to sort that out? We are at summary judgment, and under the Supreme Court's decision in Nassar at 25, 30, and 31, what the court is saying is it's his burden of proof. He must prove that the but-for cause of this termination was the discrimination complaint. Okay. He has not done that. And simply pointing to snippets in the record isn't enough. No, it is not. Shooting holes in what we've done isn't enough. Shooting holes in our investigation saying that a vendor violation isn't supposed to be something we can discipline on is not enough. He's got to present a tribal issue of fact as to causation. Not inclusive evidence. Well, actually, I think Nassar goes farther than that, Your Honor. I think what Nassar says is the reason the standard isn't strict liability, the reason it's not the simple pretext analysis, although I think under the pretext analysis we win as well, it's because it's too easy. That's what Justice Kennedy says. It's too easy for someone who knows that they are on the brink of termination, which is what Mr. Muldrow knew, to make up something and then block summary judgment simply by saying, oh, well, there's a dispute of fact, and now, you know, this has to be tried before a jury. That is not no law. There's no argument that that is any longer the law. The Supreme Court has made it clear, and I think that decision is tailor-made for this case. Well. Because that's what they found. What they found was he made this up. That was the determination. He may not like the determination. He made what up? That he made the allegation about the complaint up in order to avoid termination, and that he's trying to deflect us from the facts. You're saying he made up the bad language? Yes, Your Honor. I would have thought your position would be it didn't make any difference. No, no, I'm sorry, Your Honor. That's what we found. I'm sorry. Your Honor, I'm glad you called that to my attention because I'm speaking unclearly. What we found is that he did do the things alleged, and it did justify his discharge. As to the complaint, there is a finding. That's what we honestly believed. Whether it's right or wrong is not the issue. It's whether it's what we honestly believed. What did you honestly believe? We honestly believed that he did the things alleged, that he falsified. The most important one is, of course, that he falsified the signature, that he signed this woman's name on the invoice. That was the day before? That was the day before, Your Honor. Why did they send him out on the road if he had already falsified a record? Your Honor, he's made much of this. Look at all the prior disciplines. Your company puts up with a lot of discipline from everybody. Look at the guy they replaced him with. He wasn't exactly a judge of course, sir. Well, he's not. I don't know. I will concede that, Your Honor. He is not a comparator. It's different things, but I don't want to lose sight of your main point, which is that we do it within 24 hours. I mean, this is not like three months goes by and we haven't done anything. It's done within 24 hours. And I would also suggest, if you look, Your Honors, at the prior discipline, 136 to 140, 435 to 442, they're almost always somewhat later. And, in fact, in some instances, they're quite a bit later. They don't necessarily get everything together. In order to do this, you have to confront the employee with the union representative. You have to get everything in order and do the discipline. So, yes, it took more than 24 hours, Your Honor. That we concede. I don't think that either establishes pretext or gets him by the but-for test. Your colleague says that most of what your client classifies as discipline is, in fact, not that. So what do we make of that? I think it's totally irrelevant, Your Honor. It's not material. These are all written documentation of his poor performance, which is what he got discharged for. He got discharged for two things, falsification and then all the instances of poor performance, which are in the investigation. And that – I'm going to take it that you recognize that your witness testified, as he said, that these weren't disciplinary measures? Your Honor, I don't think that's the – whether it's a disciplinary measure or not. Yes or no, did your witness testify to that? Your Honor, let me – I don't want to misstate the record. I think she says, yes, they're not discipline, but that doesn't imply that, no, we can't use evidence of counseling or evidence of prior poor performance. That's not what she said. I don't want to say they're disciplinary actions. Well, what we say is it's written documentation of poor performance, which is exactly what it is. Suppose the court interpreted the comments that he started a forest fire at Royal Farm and go find a reason to fire him as an indication that Schmitz was really concerned that this guy had filed a complaint about racial discrimination. How does that affect the outcome of this? I don't think it does one bit, Your Honor. The fact that we were really concerned means that we'd go out and do an investigation to see what the facts actually were. We needed to determine whether he filed. The first thing Zinkin does, Zinkin goes out and he goes to both stores. He goes to store 15 and he goes to store 29, where all of the incidents of the last week have occurred. And he investigates everything. What he finds is a whole lot of evidence of poor performance. He finds he's fighting with Selina Windsor about what he admits is a miscount. And she tells him, hey, I'm going to file a vendor violation. And he starts to argue with her, and he follows her back into the office. And what the evidence he finds from talking to the manager in Windsor is that Windsor says, I didn't say it. Cremona says he didn't say it. Cremona says none of the other employees who were here say he didn't say it, which is also what their signed statements say. And then she says he hears Windsor on the phone reporting his misconduct, and he says, if she can lie, I can lie. Now, again, I'm not trying to prove that he's a liar. That's not my burden. My burden is simply to show that we believe that he engaged in poor performance, made the allegation to cover it up, and on that basis we say he deserves to be discharged. When did the company find out that he said, if she can tell a lie, I can tell a lie? Your Honor, we find it out that same day. Ms. Cremona gives a statement. That's before he was suspended? No, Your Honor. That is not before he's suspended. He's suspended first for the investigation. We're going to do the investigation. We don't know before he's fired. Oh, absolutely before he's fired. Don't forget, Your Honor, the way this works is he's suspended pending termination. We go out and we do the investigation. Then his termination becomes final after five days, and then he has a grievance hearing, and it doesn't actually become final until the 17th, and the finalization of it is, I want to be sure I get this right, is 442. In 442, Sharon affirms it.  It's a situation where we think suspending pending discharge is appropriate. The firing process starts. No question. No question. The firing process starts. Ms. Sprankle says, I was making a decision that he was going to go. We contend that was actually before she knew about it. Again, it doesn't matter because, ultimately, when she suspends him, she does know. At that point, everybody knows. But that doesn't matter. What matters is that we do an investigation, that we look at his complaint, and she affirms her prior intent, which is in writing, not once but twice, that she is going to terminate him, that he is too much trouble. He's got the nail in the coffin. On the 29th, she sends an email that says, he's too much trouble, I'm going to replace him, and I'm going to let him put the final nail in the coffin, which he does on the 3rd by falsifying that document, which is an immediate termination. That's all we really need. The other poor performance is there, and we have a right to rely on it, and we did rely on it. If this guy had an absolutely clean record, maybe the result would have been different, but that's not the issue. The issue is, did we have legitimate reasons, and did we honestly believe that they were correct? And that's been the law in this circuit for a long time. Otherwise, this court is going to be parsing out all of these disciplines and trying to second-guess the judgments and punishment. It's not a question, and I think Judge Quarles did a great job with this, on just the pretext analysis, not having the benefit of the but-for test being established by the Supreme Court in saying, no, he doesn't establish pretext, he does not carry his burden. And we've had all the discovery, summary judgment is appropriate in this case. And I think that's what the court's saying. I want to just spend a little bit of time on a couple more points, because I do think that they were raised, and I want to be sure I cover them. On the discrimination, on the straight discrimination claim, he doesn't establish a prima facie case. And again, I think Judge Quarles did an excellent job of saying, he doesn't establish that he was meeting our legitimate expectations, both before and that week. The indications are that there was an e-mail sent on the falsification. Again, it's not something we trumped up. That doesn't even make any sense. This wasn't something trumped up later. This was something that occurred the day before. And we certainly had the right to discipline him for it, because it was an offense that is an immediately terminable defense. And he had previously gotten suspended rather than fired for essentially violating the same rule. So, as to that, I think Judge Quarles was correct. He doesn't have a prima facie case. His comparator, well, there's no direct evidence of discrimination. Again, I heard counsel, suddenly he's going to try and attribute her actions to Schmidt, Ms. Windsor's actions. That's just absolutely wrong, as a matter of fact, in law. These are two separate companies. This is third party. We are not responsible for her conduct, even if it happened. But what we concluded was it didn't happen. But, again, that doesn't matter. What matters is the violation of the rules. And that, we say, did happen. And, again, whether or not it happened, we had an honest belief, and there's no evidence that that was not the case. As to the harassment claim, we did argue before Judge Quarles that, again, because it's a single incident, he admits he never complained about Windsor before to us or to anyone else. And he's not alleging that anyone said anything to him that was in any way discriminatory. He alleges the Forest Fire comments, but, again, they don't have anything to do with race. They have to do with the harassment claim. Nothing ever happened during his employment that he's pointing to. But even if you conclude, as Judge Quarles did, that it was severe and pervasive enough, then we get to the other issues of law. It's a third-party harassment, and under Ball State, the Supreme Court has, again, said, we're going to use simple negligence on those. And Judge Quarles did not have the benefit of that decision when he made his decision. This court had not previously indicated that, for third-party harassment, that we should be using simple negligence. That's what we argued. That's what Judge Quarles adopted, and he was right to do so. Under couples and bond, we think that's been guidance that this court has been giving for a while and that the court is not going to second-guess management on those things. So we did an adequate investigation. We did responsible things. We got statements from people. We got Royal Farm statements from people, and from our point of view, discharge was clearly warranted. And on the retaliation, we will use a but-for standard high burden of proof. Court acknowledges it's a high burden of proof, very different than discrimination, which is where the court's saying, not the court, where Congress said, we're going to use strict liability on that. Supreme Court said, no, on retaliation, we use a different test, different section of the law, and we are so aware of the problems with respect to someone making this up that we think that's the appropriate standard, and unless he can show right now, once discovery's over, that that was the but-for reason, this court should affirm Judge Quarles. We really do appreciate the time the court has devoted to this, and thank you very much for your attention. Thank you. Mr. Gordon, you have a few minutes for rebuttal, if you want. One of the key things that I want to point out is the court's standard of review. The facts are supposed to be construed in a light most favorable to the non-moving party, and with respect to the defendant's, I'm sorry, the appellee's motion for summary judgment,  are that the non-moving party with the letters, if they're vague, the inferences with any statement should be construed in a light most favorable to Mr. Muldrow. Another thing that I wanted to point out is that Mr. Muldrow was suspended without pay. Immediately, within two hours of making a racial discrimination complaint, he did not get paid until July. So he didn't even get paid during his pay term, even after they fired him. Is that in the record? That is in the record. Everything that I'm saying to your honors is in the record. Early delivery violation. Well, we're here because Mr. Muldrow didn't deliver the bread products early. Carrie Jarvis had indicated that Mr. Muldrow was supposed to be in the store by 4, 5, or 6 o'clock in the morning. So the early delivery violation is not violated. We're here because Mr. Muldrow didn't deliver the bread at 4, 5, or 6 in the morning. Schmidt says that they violated Royal Farms policy by delivering bread before 6 o'clock in the morning. Well, but we're not here to decide whether the prior disciplines are valid or not. We sort of take those as given, don't we? You can't re-litigate those in this case. Well, I'm not trying to, but what I am trying to show is that they're not worthy of belief. You are trying to re-litigate them. Well, I mean, they're saying that he's got all this discipline, and I'm saying I pointed out in the record several times where they indicated that he was not suspended because of his entire record. And it is in my brief that he was suspended because of these individuals, early delivery and violation, which ironically that's why we're here. The second one was falsification of documents. Now, they claim that Mr. Muldrow falsified a document. Nobody investigated that, just like nobody investigated Mr. Muldrow's claim of discrimination either. Now, they tried to say that they investigated the case, but according to the record, they were investigating whether or not a vendor violation occurred, and they never investigated Mr. Muldrow's discrimination complaint, even after they suspended him without pay. There is nothing in the record to indicate that. When you look at the letters that they secured later in the day— Well, let me just see if I understand your position. Is your position even if they had a basis for firing him, they couldn't do this if he had been subject to this discriminatory remark? No, that's not what I'm saying. Well, then why would they, if they were investigating the basis for firing him, why would they investigate the racially discriminatory remark? Well, maybe I misspoke then. Okay. Maybe I misspoke. Okay. What I did want to point out in the record, however, is that the discrimination came first. That is, he made a discrimination claim, and, in fact, I had took the time to— Well, that's what happened in this case, it seems. And this is what happened. There are statements secured that never even mentioned the N-word or whether or not this exchange ever took place. And that's where we found ourselves. So with regard to that—let me see my other issues here. Another thing that's wrong with the investigation is that Zinkan was not the appropriate person to investigate. He did it on his own. Well, but, you know, what's that got to do with it? Well, because there's a patent conflict of interest between Zinkan trying to investigate discrimination when he's responsible. He tells you, I take care of my client. That's my job. That's his sole motive, to take care of the client. Well, that's why Schmidt's Bakery exists. Well, certainly, but his job is marketing sales. He's not an HR person. He's not required to investigate. In fact, that's against their own policy that they're supposed to send their own investigators out, and that's in the record as well. So everything I've mentioned here is in the record. And when they talk about replacing him in honest belief, again, the fact's supposed to be construed in a light most favorable to Mr. Muldrow. When they say, I'm going to replace him, that doesn't mean they're going to terminate him. That means they'll get another person to fill in his spot. They may send him over to another supervisor. There are a myriad of things that they can do besides terminate. And I will submit to this honorable court that that wasn't the contemplation, again, hearkening back to that Selina Windsor letter. And all the rest of the arguments are in my brief. I believe my time has expired. Yes, it has. Thank you so much. Thank you. We will come down and greet the lawyers and then go directly into our next case.
judges: Diana Gribbon Motz, Albert Diaz, John A. Gibney, Jr.